1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

CORLIS VERNON,                          CASE NO. 2:23-cv-1180-JNW

8
                      Plaintiff,        ORDER ON DEFENDANTS' MOTION
9                                        TO DISMISS

        v.
10

CLOSETS BY DESIGN, INC. and CBD
11  FRANCHISING, INC.,

12                    Defendants.

13

14                    **1.  INTRODUCTION**

15      This matter comes before the Court on Defendants Closets by Design, Inc.

16  ("CBD") and CBD Franchising, Inc.'s ("CBDF") motion to dismiss for lack of

17  personal jurisdiction. Dkt. No. 27. After reviewing the briefing, the record, and the

18  law, the Court finds oral argument unnecessary. Because the Court finds that it has

19  specific personal jurisdiction over CBD and CBDF, the Court DENIES Defendants'

20  motion.

21                    **2.  BACKGROUND**

22      CBD and CBDF are California-based companies. Through a license

23  agreement, CBD allows CBDF "to utilize its trademark for the purpose of

franchising pursuant to a written license agreement." Dkt. No. 29 ¶ 2, 4. These franchises sell and install Closets By Design® "custom closets, garage cabinets[,] and other organizers within a designated [geographic] territory." Dkt. No. 16-2 at 2. There are two Washington CBD franchises, one serving "Seattle North WA" and the other serving "Tacoma/Seattle WA." Dkt. No. 16 ¶¶ 21-22. John Kelly Reed is the CBD franchisee serving "Seattle North." Dkt. No. 28 ¶ 5.

Plaintiff Corlis Vernon, a resident of Mill Creek, Washington, saw a CBD ad on Facebook, advertising a purportedly time-limited 40-percent discount with another 15 percent off if certain conditions were met. Dkt. No. 36-2 ¶¶ 1-2. Relying the advertised discount, Vernon called CBD and scheduled an in-home initial consultation with a sales representative. *Id.* ¶¶ 3-4. Vernon also visited the CBD website, www.closetsbydesign.com, and confirmed the 40- and 15-percent-off discounts. *Id.* ¶ 5.

During the consultation, the sales representative told Vernon that, after applying the 40-plus-15-percent discount, the price for her custom closet would be roughly $10,000, meaning that the regular price was roughly $19,600. Dkt. No. 36-2 ¶ 7. Vernon negotiated an even steeper discount and landed on $8,700 as the final price. *Id.* Vernon then contracted with CBD's Washington franchisee to build her custom closet. Dkt. No. 28 at 6. Vernon alleges, however, that had she known CBD's products "were not discounted as advertised, that they did not have the advertised regular price or market value, and that [she] was not receiving the advertised discount, [she] would not have bought them and would not have paid as much as [she] did for them." Dkt. No. 36-2 ¶ 9.

ORDER ON DEFENDANTS' MOTION TO DISMISS - 2

1
2
3
4
5
6
7
8

Vernon's claims stem from CBD and CBDF's allegedly deceptive advertising campaigns. Specifically, Vernon alleges CBD and CBDF display advertisements on their website, closetsbydesign.com, Facebook account, and physical mailers, "create[ing] an illusion that at any given time, customers are receiving a limited-time discount." Dkt. No. 16 ¶ 30. But the sales always offer at least 40-percent off the "regular prices" and run in perpetuity because, even when they are set to expire on a specific date, the same discount will appear the next day for another stretch of time. *Id.* ¶ 32.

9
10
11
12
13
14
15

Although CBD franchises are independently owned, CBD and CBDF control all advertising efforts. Each franchisee contributes to CBD's National Promotion and Protections Fund. Dkt. No. 28 ¶ 7. CBDF spends the funds on national and regional ad campaigns, including print, broadcast, and internet promotions. *Id.*; Dkt. No. 16-3 at 33. Per their Franchise Agreement, franchisees may only use advertising which CBDF has "either furnished or approved in writing in advance." *Id.* at 32.

16
17
18
19
20
21
22
23

CBD and CBDF operate the closetsbydesign.com website, which list 63 locations across the United States and Canada. Dkt. No. 16 ¶ 18. Included are "Tacoma/Seattle WA" and "Seattle North WA," which connect through hyperlinks to https://seattle.closetsbydesign.com/ and https://seattlenorth.closetsbydesign.com/. *Id.* ¶¶ 18-19. CBD and CBDF operate these location specific webpages, not the Washington franchisees. *Id.* Indeed, CBDF prohibits franchisees from establishing

separate websites or conducting business online without CBDF approval.[1] Dkt. No. 16-3 at 7.

In addition, CBD and CBDF send geographically targeted ads from the CBD Facebook account to Washington consumers that promote their perpetual 40 percent plus 15 percent off discount. Dkt. No. 16 ¶¶ 20, 45. CBD and CBDF also send print mailers to Washington consumers from their California address marketing these discounts. *Id.* ¶ 40.

Customers cannot buy CBD services from CBD's website or Facebook account. Instead, in addition to advertising 40-percent discounts, CBD's website invites consumers to "schedule a free in-home design consultation." Dkt. No. 36-1 at 2. This prompts the consumer to fill in their contact information and preferred appointment times. Dkt. No. 36-1 ¶¶ 2-4. Potential customers can submit this information by clicking "Let's Get Started" on the www.closetsbydesign.com web page or the location-specific webpages including seattle.closetsbydesign.com and seattlenorth.closetsbydesign.com. *Id.*

---

[1] The CBD Franchise Agreement states:

> [CBDF] will provide [franchises] with web pages and links to those web pages on any general Closets By Design web site [it] maintain[s.] [Franchises] are prohibited from establishing or maintaining any other web sites related to [their] Business or Location without [CBDF's] prior written consent and, except to the extent that [franchises] receive customers through the localized web page [CBDF] provide[s] to [them] or to which [CBDF] ha[s] consented, [franchises] may not establish or advertise promote or sell [CBD] services or products electronically or via the Internet.

Dkt. No. 16-3 at 7.

1

2    This is one way that CBDF identifies prospective customers for CBD

3    franchisees. CBDF generates prospective customers for custom organizer services

3    ("Leads") through "displays in home centers, catalogs, CBDF's website, direct mail[,]

4    [and] telephone sales." Dkt. No. 16-2 at 27. Then in exchange for a fee, CBDF refers

5    these Leads to the franchisee in a given geographic territory. *Id.* Vernon alleges

6    that CBD's website generates these Leads for its Washington franchisees. Franchise

7    employees then conduct the in-home consultation and install the custom design.

8    Dkt. No. 28 ¶ 7.

9    CBD franchisees must honor all discounts listed in CBD and CBDF

10    advertisements. Dkt. No. 30 at 6. CBDF also reserves the right to control franchisee

11    pricing. Specifically, CBDF "may exercise rights with respect to the pricing of

12    products and services to the fullest extent permitted by then-applicable law." Dkt.

13    No. 16-3 at 21. CBDF's rights "include (without limitation)" the following:

14    > [P]rescribing the maximum and/or minimum retail prices which [a
    > franchisee] may charge customers for the goods and/or services offered
15    > and sold at [their] franchised Business, recommending retail prices[,]
    > advertising specific retail prices for some or all products by [their]
16    > franchised Business, which prices [a franchisee] will be compelled to
    > observe, engaging in marketing, promotional prices . . . and otherwise
17    > mandating, directly or indirectly the maximum and/or minimum retail
    > prices which [their] franchised Business may charge the public for the
18    > products and services it offers[.]

19    *Id.* at 21-22.

20    Contrariwise, Jerry Egner, CBDF President, states that "[w]hile CBDF has a

21    proprietary price book of suggested retail prices for numerous components of home

22    organization systems, CBDF does not control the pricing of its franchisees either on

23    the component or system level and franchisees are free to negotiate prices with the

consumer directly." Dkt. No. 28 ¶ 7. Egner adds that although "there are certain national and regional promotions offered from time to time, because home organization system is a custom construction project, the price is normally individually negotiated between the franchisee's designer and the customer." *Id.* ¶ 3.

Alleging that the national and regional promotions CBD and CBDF advertise are fake discounts and deceptive advertising, Vernon claims Defendants violated the Washington Consumer Protection Act (CPA), breached contracts made by franchisees operating as their agents, breached their express warranties, received unjust enrichment, and both negligently and intentionally misrepresented discounts to consumers. Dkt. No. 16 ¶¶ 93-151. Vernon also alleges CBD and CBDF conspired to conduct a deceptive advertising scheme and "aided and abetted the Closets by Design Washington franchises" in violating the CPA. Dkt. No. 16 ¶¶ 152-164.

## 3.  DISCUSSION

### 3.1  Legal standard.

#### 3.1.1    Rule 12(b)(2).

"Where a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). When the motion is based on written materials, rather than an evidentiary hearing, a plaintiff's pleadings and affidavits need only make a "prima facie"

showing of personal jurisdiction. *Id.* (citing *Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 128 (9th Cir.1995)).

In this context, a prima facie showing means that the plaintiff has produced admissible evidence which, if believed, could establish the existence of personal jurisdiction. *See Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003). "The plaintiff cannot simply rest on the bare allegations of its complaint if an allegation is challenged by the defendant, but uncontroverted allegations in the complaint must be taken as true." *Corker v. Costco Wholesale Corp.*, 585 F. Supp. 3d 1284, 1289 (W.D. Wash. 2022) (cleaned up). Any conflicts between sworn statements must be resolved in favor of the plaintiff. *Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996).

If no federal statute authorizes personal jurisdiction, federal courts apply the law of the state in which they sit to determine whether the exercise of personal jurisdiction over a defendant is appropriate. *See Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (citing Fed. R. Civ. P. 4(k)(1)(A)). Washington's long-arm statute permits courts to "exercise jurisdiction over a nonresident defendant to the extent permitted by the due process clause of the United States Constitution." *SeaHAVN, Ltd. v. Glitnir Bank*, 226 P.3d 141, 149 (Wash. Ct. App. 2010).

Jurisdiction reflects due process only if the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945). Based on the extent and nature of the contacts, the Court can exercise either general or specific jurisdiction. *Goodyear Dunlop Tires*

ORDER ON DEFENDANTS' MOTION TO DISMISS - 7

*Operations, S.A., v. Brown,* 564 U.S. 915, 919 (2011). Only specific jurisdiction is at issue here.

### 3.1.2    Specific personal jurisdiction.

"The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017) (internal quotations omitted). The Ninth Circuit uses a three-part test to determine whether specific jurisdiction exists:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802.

The plaintiff bears the burden of satisfying the first two prongs of the test. *Id.* If she does, the burden shifts to the defendant to "present a compelling case" that the exercise of jurisdiction would not be reasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985).

The first prong of the specific-jurisdiction test operates "somewhat differently in tort and contract cases." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006). The Ninth Circuit has said that "the prong incorporates two distinct concepts—'purposeful direction' and 'purposeful availment.'" *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154,

1162 (9th Cir. 2023), *cert. denied,* 144 S. Ct. 826 (2024). Courts have generally applied purposeful direction to tort claims and purposeful availment to claims sounding in contract. *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir. 2020). But "this line is [not] a hard-and-fast rule" and there is no "rigid dividing line between these two types of claims." *Davis*, 71 F.4th at 1162 (9th Cir. 2023). Instead, "the first prong may be satisfied by purposeful availment, by purposeful direction, or by some combination thereof." *Id.*

Because "[p]ersonal jurisdiction over each defendant must be analyzed separately," the Court applies the three-part specific jurisdiction test to CBDF and CBD. *Harris Rutsky & Co. Ins. Servs.,* 328 F.3d at 1130.

**3.2    The Court has specific personal jurisdiction over CBDF.**

### 3.2.1    CBDF purposefully availed itself of the privileges of conducting business in Washington.

The Court begins by considering whether the purposeful availment test can support jurisdiction here. To establish purposeful availment, courts "look at a defendant's 'entire course of dealing' with the forum state—'not solely the particular contract or tortious conduct giving rise to a plaintiff's claim.'" *Davis*, 71 F.4th at 1163 (quoting *Glob. Commodities Trading Grp., Inc.*, 972 F.3d at 1108). It is established when a defendant "'purposefully avails itself of the privilege of conducting activities' or 'consummate[s] [a] transaction' in the forum, focusing on activities such as delivering goods or executing a contract." *Yahoo! Inc.* 433 F.3d at 1206 (quoting *Schwarzenegger*, 374 F.3d at 803) (alterations in original). Or when a

defendant deliberately reaches out beyond its home to exploit a market in the forum State. *Davis,* 71 F.4th at 1163. But a single "contract with an out-of-state party *alone* can[not] automatically establish sufficient minimum contacts in the other party's home forum[.]" *Burger King Corp.*, 471 U.S. at 478. Instead, courts must look to multiple factors including "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to assess the out-of-state parties' contacts. *Id.* at 479.

For example, in *Burger King*, a franchisor headquartered in Florida sued its out-of-state franchisee. The Court held that the franchisee purposefully availed himself of the forum state because "he entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida," and thus "his relationship to the company in Florida [could] in no sense be viewed as 'random,' 'fortuitous,' or 'attenuated.'" *Id.* at 479-80 (quoting *Hanson v. Denckla*, 357 U.S. at 253).

The same rationale applies here. CBDF, a franchisor, entered a carefully structured relationship with its Washington franchisees that envisions continued involvement with their businesses. Their Franchise Agreement requires that franchisees contribute to CBDF's National Promotion and Protections Fund, which engages in advertising on the franchisee's behalf. Indeed, CBDF reserves the right to control all advertising and online activities. CBDF's advertising and marketing materials are targeted directly to Washington consumers—it maintained Washington-specific webpages and geographically targeted Facebook ads. *See Reingold v. Elements Therapeutic Massage, LLC*, No. SACV 20-785-GW-DFMX,

2020 WL 13303513, at *5 (C.D. Cal. Aug. 18, 2020) ("By alleging that [the out-of-state franchisor] manages marketing and advertising for the [the resident franchisee], which the Court can reasonably infer involves advertising to potential customers in [the forum state], Plaintiff has alleged that [the out-of-state franchisor] specifically targeted consumers in the forum state" and it "has purposefully availed itself of the privilege of conducting business within [the forum state].").

Accordingly, the Court finds that CBDF's conduct meets the first prong of the specific jurisdiction test in that CBDF purposefully availed itself of the forum state, Washington. As a result, the Court need not also consider whether CBDF purposefully directed its activities at Washington, too.

### 3.2.2   Vernon's claims arise out of CBDF's Washington-related activities.

"In determining whether a claim 'arises out of' the non-resident's forum-related activities, many courts apply a 'but for' test." *Lebow v. Huston Buick GMC Cadillac, Inc.*, No. 222CV01062MEMFKS, 2022 WL 2189475, at *6 (C.D. Cal. Apr. 22, 2022) (citing *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995)).

Vernon alleges that her claims arise out of CBDF's Washington-targeted franchising and advertising because she relied on the sales promoted in online ads that the Washington franchisee was bound to honor per the terms of its agreement with CBDF. In response, CBDF argues Vernon's claims did not arise from its conduct in this forum because "it is clear that [Vernon's] pricing was not based on

1    any promotion or advertisement but was, instead, individually negotiated." Dkt. No.

2    27 at 8.

3         Neither party contests that Vernon negotiated a lower price for her custom

4    closet with a CBD franchise employee after her in-home consultation. But CBDF's

5    conduct still played a crucial role given that its advertising led Vernon to seek

6    CBD's services in the first place and rely on the 40-plus-15-percent discount. Thus,

7    Vernon meets the second prong required for specific personal jurisdiction.

8         **3.2.3    The exercise of jurisdiction is reasonable here.**

9         Once a plaintiff satisfies the first two prongs of the test, the burden shifts

10   back to the defendant to present a "compelling case that the exercise of jurisdiction

11   would not be reasonable." *Menken v. Emm*, 503 F.3d 1050, 1057 (9th Cir. 2007)

12   (internal quotes omitted). The Supreme Court has set forth several factors that

13   courts may consider: "the burden on the defendant, the forum State's interest in

14   adjudicating the dispute, the plaintiff's interest in obtaining convenient and

15   effective relief, the interstate judicial system's interest in obtaining the most

16   efficient resolution of controversies, and the shared interest of the several States in

17   furthering fundamental substantive social policies." *Burger King Corp.*, 471 U.S. at

18   477 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)).

19        CBDF does not address these factors, and therefore, it fails to carry its

20   burden of showing why the Court's exercise of personal jurisdiction would be

21

22

23

1
2

unreasonable. Accordingly, the Count finds it has specific personal jurisdiction over CBDF based on its own conduct.[2]

3
4

### 3.3    The Court finds specific personal jurisdiction over CBD.

### 3.3.1    CBD purposefully directed its advertising to Washington.

5
6
7
8
9
10
11
12
13
14

Vernon alleges that, together with CBDF, CBD maintained the CBD website and Washington location webpages, targeted Facebook ads to users located in Washington, and sent print advertisement via mail to Washington residents. Unlike CBDF, CBD does not act as franchisor to Washington franchisees. It also does not directly sell products or services to Washington consumers. Vernon fails to allege any action taken by CBD in the forum state—therefore, it has not purposefully availed itself of the privilege of conducting activities in Washington. *See Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006) ("[E]vidence of availment is typically action taking place in the forum that invokes the benefits and protections of the laws in the forum.").

15
16
17
18
19

Evaluating the circumstances under the purposeful direction test, however, leads to a different result. Purposeful direction is judged under the three-part "*Calder* effects test." *Id.* at 1156. Under the effects test, "the defendant must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Doe v.*

20
21
22
23

---

[2] Because the Court finds specific personal jurisdiction over CBDF based on its own conduct it does not consider whether of CBD's Washington franchisee's contacts with Washington can be imputed onto CBDF.

*WebGroup Czech Republic, A.S.*, 89 F.4th 1188, 1198 (9th Cir. 2024) (internal quotations omitted).

Vernon has alleged the first element of the *Calder* effects test. CBD committed intentional acts; that is; it acted with acted "an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act" by operating a website, publishing ads, and sending letters. *Schwarzenegger*, 374 F.3d at 806. CBD does not contest this point.

The nature of Vernon's allegations also satisfies the third element—one could reasonably know that sending deceptive advertising to consumers in a geographic area where they are likely to rely on the promoted discounts to buy services from local franchisees would cause harm in that forum. *See Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1091 n. 2 (9th Cir. 2023) (explaining that "the specific facts and claims at issue" in the case impact the analysis, e.g., "if a plaintiff were to allege that he was poisoned by a product, then the shipment of that product to the plaintiff's forum would suffice to show that the defendant knew that the harm is likely to be suffered in the forum state") (internal quotes omitted).

The second element presents the closest question—whether CBD expressly aimed its intentional conduct at Washington, the forum state. Most of CBD's Washington contacts concern internet advertising, an area in which courts often use "the *Zippo* sliding scale approach" to establish the likelihood that personal jurisdiction would be proper. 4A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1073 (4th ed.). At one end of the sliding scale "are situations where a defendant clearly does business over the Internet," i.e., "the defendant enters into

contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet[.]" *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997). Cases involving these "active" websites likely support a court's jurisdiction over the defendant. At the opposite end of the sliding scale are passive websites "where a defendant has simply posted information . . . which is accessible to users in foreign jurisdictions." *Id.* In the middle, interactive websites that allow an exchange of information. *Id.* In these cases, the court must examine "the level of interactivity and commercial nature of the exchange of information." *Id.*

Vernon argues that CBD's website is interactive because it has "geographically targeted webpages that are relevant almost exclusively to visitors from Washington" that invite "potential Washington consumers to schedule design consultations in Washington[.]" Dkt. No. 36 at 13-14. However, these consultations occur between local businesses and the consumer—CBD does not actually transact business with the website user. This distinguishes CBD's activities from the line of cases in which courts have found personal jurisdiction based on companies selling products through a website to in-state customers. *See, e.g., Herbal Brands, Inc.*, 72 F.4th at 1088 (a defendant that during its regular course of business sells physical product via an interactive website and causes that product to be delivered to the forum, expressly aimed conduct at that forum); *State of Washington, Dep't of Revenue v. WWW.Dirtcheapcig.com, Inc.*, 260 F. Supp. 2d 1048, 1052 (W.D. Wash. 2003) ([I]t is well settled that a non-resident's maintenance of an interactive

website through which consumers may purchase goods or services is sufficient to meet [the purposeful-availment] element.").

The Ninth Circuit instructs that "operation of an interactive website does not, by itself, establish express aiming" because this mechanical standard would subject sellers "to specific jurisdiction in every forum in which [their] website was visible, whether or not the seller actually consummated a sale." *Herbal Brands, Inc.*, 72 F.4th at 1091. "But operating a website 'in conjunction with 'something more'—conduct directly targeting the forum—is sufficient' to satisfy the express aiming prong." *Id.* at 1092 (quoting *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218 1229 (quoting *Rio Properties, Inc. v. Rio Intern. Interlink*, 284 F.3d 1007, 1020 (9th Cir. 2002) (the defendant' specific targeting consumers in Nevada through radio and print advertisements in addition to the website was enough to confer jurisdiction over it))).

For example, in *Am. Auto. Ass'n, Inc. v. Darba Enterprises Inc.*, the district court exercised personal jurisdiction over the defendant because it operated a website that wrongly displayed the American Automobile Association's ("AAA") trademark and invited "users to enter their zip codes to get 'insurance quotes.'" Case No. C 09-00510 SI, 2009 WL 1066506, at *5 (N.D. Cal. Apr. 21, 2009). The district court found "[i]t is reasonable to infer that the third parties to whom defendant sold this contact information targeted potential customers based on their geographic location." *Id.*

Like the website at issue in *Am. Auto. Ass'n*, CBD operates an interactive website that includes Washington specific location webpages inviting interested

consumers to enter their contact information. CBD, together with CBDF, sells these "Leads" to Washington franchisees. Moreover, CBD's Facebook ads appear for users in Washington—supporting Vernon's allegations that CBD targets Washington consumers geographically. And CBD sends printed ads to Washington addresses. Accordingly, the Court finds that the "something more" element has been satisfied and that CBD expressly aimed advertising activities at Washington state.

### 3.3.2    Vernon's claims arise out of CBD's Washington-related activities.

Vernon's claims center around CBD's allegedly deceptive advertising promoted on its website, Facebook account, and print mailers. Therefore, CBD's Washington targeted advertising satisfies the "but for" test because had Vernon not relied on this advertising, she allegedly would not have purchased a CBD custom closet for the price that she did. *See Lebow*, No. 222CV01062MEMFKS, 2022 WL 2189475, at *6.

### 3.3.3    It is reasonable for the Court to exercise specific personal jurisdiction over CBD.

Like the CBDF analysis, CBD fails to provide a compelling reason why the exercise of personal jurisdiction would not be reasonable here. Because it is CBD's burden to establish this element, and because it fails to do so, the Court finds that it has specific personal jurisdiction over CBD.

**3.4     The Court denies Defendants' requests for attorneys' fees.**

Under RCW 4.28.185(5), CBD and CBDF ask that the Court award reasonable attorneys' fees for the costs they incurred in presenting their jurisdictional defense. Given that Vernon successfully establishes personal jurisdiction, the Court declines to award attorneys' fees.

## 4.   CONCLUSION

Accordingly, the Court DENIES CBD and CBDF's motion to dismiss, Dkt. No. 27.

Dated this 30th day of September, 2024.

Jamal N. Whitehead
United States District Judge

ORDER ON DEFENDANTS' MOTION TO DISMISS - 18